**PHAR–MOR, INC., et al., Appellants,**

v.

**STROUSS BUILDING ASSOCIATES, et al., Appellees.**

**Bankruptcy No. 4:94 CV 1698.**

United States District Court,
N.D. Ohio,
Eastern Division.

Jan. 13, 1997.

Robert J. White, Jr. and David A. Hollander, O'Melveny & Myers, Los Angeles, CA,

Michael A. Gallo, Jr., Nadler, Nadler & Burdman, Youngstown, OH, for plaintiffs.

Frederick S. Coombs, III, Harrington, Huxley, Smith, Mitchell & Reed, Youngstown, OH, Mark Schlachet, Climaco, Climaco, Lefkowitz & Garofoli, Cleveland, OH, for defendants.

### MEMORANDUM AND ORDER

OLIVER, District Judge.

This bankruptcy appeal raises the issue of whether the debtor-in-possession in this case may reject a limited partnership agreement as an executory contract, pursuant to 11 U.S.C. § 365. The bankruptcy court decided this question in the negative, and debtor-in-possession Phar–Mor, Inc. (together with 15 affiliated debtors) appeals. Because this court concludes the bankruptcy court erred as a matter of law, the decision of the bankruptcy court is reversed and the case is remanded to the bankruptcy court for further proceedings consistent with this opinion.

### I.

The parties do not dispute the following facts. In October of 1986, Phar–Mor and several businessmen formed an Ohio limited partnership called Strouss Building Associates ("SBA–LP"). The general partner of SBA–LP was Michael Monus, then the president of Phar–Mor. Monus owned 10% of SBA–LP, Phar–Mor owned 60%, and three other limited partners unaffiliated with Phar–Mor owned 10% each. The purpose of SBA–LP was to buy a building in downtown Youngstown, Ohio, refurbish it, and rent it to tenants. The main tenant of this building was to be Phar–Mor, which would use the building for its corporate headquarters.

In 1987, Phar–Mor decided to divide and sell its limited partnership interest in SBA–LP. To do so, Phar–Mor formed a Pennsylvania limited partnership called Phar–Mor Centre Associates ("PMCA–LP"). In exchange for $315,000, Phar–Mor sold its 60% limited partnership interest in SBA–LP to PMCA–LP. Phar–Mor also became the general partner of PMCA–LP, with a 1% share, while the remaining 99% went to approximately 50 Phar–Mor directors, officers, executives, and shareholders.

As Phar–Mor grew in size, its need for office space also grew. Accordingly, an Ohio general partnership called Erie Terminal Development Company ("Erie Partnership") was formed in 1989 for the purpose of acquiring and refurbishing a second building in Youngstown, Ohio. Again, it was expected that this building would be leased in significant part to Phar–Mor. There were two partners in the Erie Partnership, each holding a 50% share: SBA–LP and Youngstown Central Area Community Improvement Corporation ("YCACIC"), an Ohio non-profit entity. The result of all these partnerships is shown graphically below.

The partners of SBA–LP and PMCA–LP obtained terrific profits. For example, SBA–LP's partners achieved a 548% cash return on their investment in just over six years.

PMCA–LP's partners achieved a 474% cash return on their investment in about 5½ years. These figures do not include "historic building rehabilitation tax credits," which if ultimately used could triple these returns.

In August of 1992, Phar–Mor discovered that several of its senior officers, including Monus, had fraudulently misappropriated cash from Phar–Mor and overstated Phar–Mor's income. Monus and others have been found guilty of various financial crimes in connection with these actions. The victim of this embezzlement was Phar–Mor.

On August 17, 1992, Phar–Mor filed in bankruptcy court for relief under 11 U.S.C. § 11. On May 31, 1994, Phar–Mor filed a motion in bankruptcy court seeking to reject the PMCA–LP limited partnership agreement as an executory contract, pursuant to 11 U.S.C. § 365. This motion was opposed by Erie Partnership, SBA–LP, and Michael Monus. As may be seen from the chart above, allowing Phar–Mor to reject the PMCA–LP limited agreement would have "domino effect" repercussions affecting virtually every other entity on the chart. Specifically, if Phar–Mor left its position as general partner of PMCA–LP and was not replaced, the 50 limited partners of PMCA–LP would incur liability for recapture of tax benefits and PMCA–LP would dissolve. The dissolution of PMCA–LP would then cause the tax dissolution of SBA–LP, because over 50% of SBA–LP would change hands. Similarly, the dissolution of SBA–LP would in turn threaten the tax dissolution of Erie Partnership. In each case, the dissolution of the three partnerships would trigger tax credit recapture liability for all the partners.

One of the reasons Phar–Mor sought to reject the PMCA–LP limited partnership agreement was that, after reading the report of the examiner appointed by the bankruptcy court, Phar–Mor came to believe some of the transactions undertaken earlier by PMCA–LP and SBA–LP were improper and had harmed Phar–Mor. For example, Phar–Mor became concerned that PMCA–LP's lease of space to Phar–Mor was voidable as an interested party transaction. Similarly, Phar–Mor became concerned that the transfer of its 60% limited partnership in SBA–LP to PMCA–LP was voidable as an interested party transaction. Phar–Mor asserts, and defendants do not dispute, that as debtor-in-possession, Phar–Mor is charged with the fiduciary duty of maximizing the bankrupt estate's assets. Thus, Phar–Mor has a fiduciary duty to pursue its possible claims against PMCA–LP and SBA–LP. Of course, this fiduciary duty conflicts with Phar–Mor's roles as general partner of PMCA–LP and as fractional limited partner of SBA–LP.

As noted, Erie Partnership, SBA–LP, and Michael Monus all opposed Phar–Mor's motion to reject the PMCA–LP limited partnership agreement. In its July 5, 1994 Order, the bankruptcy court overruled Monus's objection, on the basis that Monus did not appear at the hearing. Bankruptcy Order at 4. However, the bankruptcy court found the other parties' opposition well-taken, and denied Phar–Mor's motion. Phar–Mor appeals that ruling.

## II.

■■■ Section 365 of the Bankruptcy Code assists debtors in their efforts at reorganization by allowing them to *assume* favorable pre-petition executory contracts and *reject* unfavorable ones. Generally, if the debtor assumes a pre-petition executory contract, the contract is effectively converted into a post-petition contract, so that both the debtor and the contracting party can still compel the other to perform. If the debtor rejects the pre-petition executory contract, the contract is treated as having been terminated prior to the debtor's filing of bankruptcy, so that the contracting party's claim for damages (if any) has the same status as all other pre-petition claims.[1] Whether an

---

1. The effect of rejection or assumption of a contract is explained in *In re Sudbury, Inc.*, 153 B.R. 776, 778 (Bankr.N.D.Ohio 1993):

 Section 365 is designed to give the trustee the option of assuming contracts where performance by a third party will benefit the estate or to forego the third party's performance where the benefit to the estate will be less than the cost. If the contract is assumed, the third party must perform and the debtor must render at full value the debtor's bargained for performance on which the third party's performance was conditioned. If the contract is rejected, the third party is not obligated to perform but has only a prepetition claim for its damages.

executory contract is "favorable" or "unfavorable" is left to the sound business judgment of the debtor. *Lubrizol Ents., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046–47 (4th Cir.1985), *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1985). Courts should generally defer to a debtor's decision whether to reject an executory contract. *Id.* at 1047.

SBA–LP and Erie Partnership do not argue that Phar–Mor's desire to reject the PMCA–LP limited partnership agreement is an abuse of its discretionary business judgment. Rather, appellants claim that the PMCA–LP limited partnership agreement is so far performed that it is not an executory contract. The bankruptcy court agreed with appellants.

In reviewing the bankruptcy court's decision, this court must not set aside findings of fact unless they are clearly erroneous. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); Fed.R.Bankr.P. 8013. The bankruptcy court's conclusions of law are subject to de novo review. *In re Flo-Lizer, Inc.*, 946 F.2d 1237, 1240 (6th Cir. 1991).

### III.

As the Sixth Circuit Court of Appeals has noted, "Congress did not provide the courts with a definition of 'executory contracts'" in the context of 11 U.S.C. § 365. *In re Jolly,* 574 F.2d 349, 350 (6th Cir.1978), *cert. denied sub nom Still v. Chattanooga Memorial Park,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). Indeed, "once a contract ceases to be executory, for all practical purposes, it ceases to exist." *Id.* Courts agree, however, that Congress did not mean to allow a bankrupt debtor to reject *any* contract not fully performed. *In re Norquist,* 43 B.R. 224, 225 (Bankr.E.D.Wash.1984). The courts have thus had to define the term "executory contract."

■ Many courts have adopted the "Countryman test" to determine whether a contract is executory. This test calls executory "a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Magness,* 972 F.2d 689, 694 (6th Cir.1992) (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973)). The Sixth Circuit, however, has stated that the Countryman test is "helpful but not controlling in the resolution of what is an executory contract." *Id.* Rather, the "key" to determining whether a contract is executory "is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act." *Jolly,* 574 F.2d at 351.[2]

■ This widely cited language in *Jolly* articulates what is called the "functional approach." *In re Sentle Trucking Corp.*, 93 B.R. 551, 557 (Bankr.N.D.Ohio 1988). Under the functional approach, courts must "look first at the results which would obtain if the contract were held to be executory." *Id.* Generally, a court should find the contract executory if such a determination allows the debtor to reject a burdensome or unfavorable contract. A court may find a contract is executory under the functional approach, even though it might not have found the contract to be executory under the Countryman test. *Jolly,* 574 F.2d at 351; *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687, 703 n. 24, 707–09 (Bankr.S.D.N.Y. 1992) (following and extending *Jolly* ); *Norquist,* 43 B.R. at 226–27.

**2.** Appellants seem to suggest that because the Sixth Circuit recites the Countryman test in *In re Terrell,* 892 F.2d 469, 471 n. 2 (6th Cir.1989), which was decided after *Jolly,* the Sixth Circuit no longer follows the functional approach and calls for simple application of the Countryman test. This court disagrees, not only because other bankruptcy courts have so widely followed *Jolly,* but because *Terrell* itself cites *Jolly. Id.* at

471. Moreover, the Court of Appeals confirmed the propriety of the functional approach in *In re Magness,* 972 F.2d 689, 694 (6th Cir.1992), which was decided after *Terrell.* The reason the *Terrell* court never undertook a functional analysis was because in that case, the Countryman test *alone* so clearly revealed the contracts in question were executory.

It is notable that assumption of a contract already fully performed by the other contracting party, but . not by the debtor, is unlikely to benefit the estate. *Jolly* explicitly suggested that such unilaterally unperformed contracts might be "executory" under section 365. Noting that "executory contracts involve obligations which continue into the future," the court emphasized that "[g]enerally they are agreements which include an obligation *for the debtor* to do something in the future." *Jolly,* 574 F.2d at 351 (emphasis added). Indeed, the *Jolly* court determined the agreement before it was not executory because "there is no obligation *for the debtor* to do anything in the future." *Id.* (emphasis added).

■■■ Certainly, a contract need not be . executory on both sides for it to be burdensome on the estate. Whether the other contracting party has fully performed under the contract can be irrelevant to whether breach or affirmance of the contract will be most beneficial to the estate. *See Norquist,* 43 B.R. at 226–27 (noting that the contractual burden on the debtor-in-possession, and the benefit of rejecting the contract, can remain the same regardless of whether the other contracting party has fully performed). The ultimate purpose behind section 365 is "to allow a trustee to pick and choose among the debtor's agreements and assume those which benefit the estate and reject those which do not." *In re G–N Partners,* 48 B.R. 462, 465 (Bankr.D.Minn.1985).[3] "Working backwards," then, the court must answer two questions in this case: (1) under the PMCA–LP limited partnership agreement, does Phar–Mor (if not its partners) have material unfulfilled obligations extending into the fu-

ture? and (2) might Phar–Mor's rejection of the PMCA–LP limited partnership agreement reasonably benefit the estate?

### A. Unfulfilled Material Obligations.

■■ The bankruptcy court addressed the factual issue of whether the parties to the PMCA–LP limited partnership agreement had unfulfilled material obligations. It determined that "Phar–Mor has continuing duties under the [PMCA–LP limited] partnership agreement, including making distributions, preparing records for taxes, and various management functions." Bankruptcy Order at 7. The bankruptcy court further found that the limited partners have contingent, ongoing obligations to make capital contributions in the future. Bankruptcy Order at 8. Phar–Mor also has continuing discretionary duties, if necessary, to obtain additional capital contributions from the limited partners, and take action against them if they fail to make these contributions. *Id.*[4]

The bankruptcy court's findings of fact in this regard are not clearly erroneous, but they are not complete. The bankruptcy court failed to address certain other material unfulfilled obligations of the parties, which were at least implicitly raised by Phar–Mor.

■■ Beyond the *specific* unfulfilled obligations of the various partners identified by the bankruptcy court, all of the partners in the PMCA–LP limited partnership agreement also have a more *general* obligation: to continue as partners throughout the life of the agreement, absent revocation or termination in some manner. Partnership agreements vary from ordinary contracts in this

---

**3.** The statutory purpose behind section 365 is stated more fully in *Norquist,* 43 B.R. at 225–26:

> The purpose for allowing the trustee or debtor-in-possession to assume or reject an executory contract is to enable a trustee ·or troubled debtor to take advantage of a contract that will benefit the estate by assuming it or alternatively, to relieve the estate of a burdensome contract by rejecting it. Rejection of an executory contract serves two purposes. It relieves the debtor of burdensome future obligations while he is trying to recover financially and it constitutes a breach of a contract which permits the other party to file a creditor's claim. *In re Jolly,* 574 F.2d 349, 350 (6th Cir.1978). Further, the performance of burdensome contracts

by the trustee or debtor-in-possession tends to create a preference among equally deserving creditors and such performance may suffocate reorganization efforts intended for the benefit of the debtor and creditors alike. Therefore, the trustee or debtor-in-possession faced with an executory contract must decide whether breach or affirmance of the contract will be most beneficial to the estate. *Id.* at 351.

**4.** That some of these duties are discretionary and contingent on the performance of the partnership's underlying investments does not prevent the contract from being executory. *Lubrizol,* 756 F.2d at 1046 ("[c]ontingency of an obligation does not prevent its being executory.")

regard in that the continuing duty of the partners to associate with each other has significance apart from any specific tasks, functions or other obligations a partner must perform. This obligation of continued association is a substantial one [5] and appears to be more important than any other in this case, as evidenced by the tax and other consequences to the parties should Phar–Mor be allowed to reject the limited partnership agreement.[6]

The bankruptcy court erred by not fully appreciating the materiality of the partners' continuing, unfulfilled obligation to associate with each other. The future obligations of Phar–Mor identified by the bankruptcy court, together with its obligation to continue to associate with its partners, compels the conclusion as a matter of law that Phar–Mor continues to have substantial unfulfilled obligations into the future under the PMCA–LP limited partnership agreement. Indeed, the partners' continuing obligation to associate with each other also strongly suggests an ultimate finding of executoriness under the Countryman test, which requires material unfulfilled obligations on both sides.

### B. Benefit to the Estate.

The second part of the functional approach requires a determination of whether rejection of the partnership agreement would benefit the estate. To some extent, whether Phar–Mor's rejection of the PMCA–LP limited partnership agreement might reasonably benefit the estate is a measure of the materiality of Phar–Mor's unfulfilled obligations—the more material are the unfulfilled obligations, the more might rejection benefit the estate. The materiality of these obligations is generally measured from the debtor's point of view. As noted earlier, whether Phar–Mor's rejection of the PMCA–LP limited partnership agreement might reasonably benefit the estate is normally left to the sound business judgment of the debtor. *Lubrizol,* 756 F.2d at 1046–47. Nonetheless, a bankruptcy court may override the decision

---

5. Perhaps that is why in every other case cited to the court addressing the question of whether a limited partnership agreement is executory under Section 365, the courts found (or the parties stipulated) that the agreements were executory. The bankruptcy court either distinguished these cases or declined to follow them. Bankruptcy Order at 4–8. In part, this was because the bankruptcy court declined to use the functional approach to determine whether the agreement was executory. *Id.* at 8.

 *See In re LeRoux,* 167 B.R. 318, 320 (Bankr. D.Mass.1994) (finding real estate limited partnership agreement to be executory, because general partner had ongoing duty to "do all things which may be reasonably necessary to manage the affairs and business of the partnership"); *In re Cardinal Indus., Inc.,* 116 B.R. 964, 972–73 (Bankr.S.D.Ohio 1990) (trustee conceded that real estate limited partnership agreements, some of which had apparently been performed as "fully" as the PMCA–LP limited partnership agreement in this case, were executory); *In re Heafitz,* 85 B.R. 274, 282–84 (Bankr.S.D.N.Y.1988) (finding oil & gas limited partnership agreement executory because, inter alia, the general partner had an ongoing "obligation to make distributions, to furnish additional financial statements, to prepare quarterly progress reports, and to maintain the books and records of the partnership").

 *See also In re Catron,* 158 B.R. 624, 626 (Bankr.E.D.Va.1992), *affirmed,* 158 B.R. 629, 634 (E.D.Va.1993), *affirmed,* 1994 WL 258400 (4th Cir. June 14, 1994) (concluding without discussion that real estate general partnership agreement is executory contract); *In re Manor Place Development Assocs., L.P.,* 144 B.R. 679, 684 (Bankr.D.N.J.1992) (concurring in parties' assumption that real estate limited partnership agreement was executory); *In re Priestley,* 93 B.R. 253, 258 (Bankr.D.N.M.1988) (finding real estate limited partnership agreement was executory, in part because "[s]ubstantial performance remained due from the debtor"); *In re Corky Foods Corp.,* 85 B.R. 903, 904 (Bankr.S.D.Fla, 1988) (calling it "fundamental" that "a partnership agreement is an executory contract"); *In re Sunset Developers,* 69 B.R. 710, 712 (Bankr.D.Idaho 1987) (concluding a real estate limited partnership agreement was executory because the partners "each have an obligation to contribute amounts in cash to the partnership when required"); *In re Rittenhouse Carpet, Inc.,* 56 B.R. 131, 132–33 (Bankr.E.D.Pa.1985) (concluding without discussion that real estate limited partnership agreement was executory); *In re Harms,* 10 B.R. 817, 820–21 (Bankr.D.Colo.1981) (eschewing Countryman test, and finding real estate limited partnership was executory because partners still had complex, unfulfilled obligations); *In re Fidelity America Mortg. Co.,* 10 B.R. 781, 782 (Bankr.E.D.Pa.1981) (real estate limited partnership agreement found to be executory, without discussion).

6. Because the courts are near unanimous in finding that limited partnership agreements are executory contracts, the court dismisses appellees' argument that the PMCA–LP limited partnership agreement is not a contract at all, but merely a "property interest."

of the debtor to reject an executory contract. *Id.* (court must decide "whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice").

 The bankruptcy court never reached the question of whether Phar–Mor's desire to reject the contract was an abuse of Phar–Mor's discretionary business judgment. This case is clearly not one where rejection benefits the debtor because the rejected contract *itself* explicitly places concrete, onerous burdens on the debtor (for example, where a largely unperformed contract obligates the debtor to build an office building). Instead, Phar–Mor asserts that by rejecting the contract, it is freed to pursue claims against appellees that may increase the value of its estate. The examiner appointed by the bankruptcy court identified possibly voidable transactions that might have improperly enriched others at the expense of Phar–Mor. In its current position as general partner of PMCA–LP, Phar–Mor has contractual obligations that conceivably conflict with its duty as debtor-in-possession to pursue these claims. *See In re Harms,* 10 B.R. 817, 822 (Bankr.D.Colo.1991) (recognizing inherent conflict of interest when a general partner in a limited partnership becomes a debtor-in-possession). Given this conflict, it may be reasonable for Phar–Mor to believe that rejection of the PMCA–LP limited partnership agreement will "relieve the debtor of burdensome future obligations while [it] is trying to recover financially." *Norquist,* 43 B.R. at 225.[7] Rejection of the mostly performed contract in this case could benefit Phar–Mor because the agreement is forcing debtor to remain partners with parties from whom it wants to disassociate and whom it wants to investigate for financial misdeeds.

 Because the bankruptcy court did not reach the question of the benefits to the estate that rejection might bring, this court remands the case to allow the bankruptcy court to address this issue. In assessing these benefits, the bankruptcy court must assess the different quality of the benefits that flow from rejection of the different obligations discussed above. For example, the law expects each partner to behave in such a way that it is reasonable to expect all the partners to continue their association together.[8] Thus, if a partner or partners engage in self-dealing or other forms of disloyalty, or in conduct that negatively reflects on the partnership as a whole, it may be unreasonable for the partnership to continue. While the benefits of being able to reject a partnership agreement under these circumstances may be very real, these benefits are qualitatively different from the direct benefit of avoiding the remaining concrete obligations of the PMCA–LP limited partnership agreement itself (e.g., preparation of tax returns). Indeed, defendants argue in passing that Phar–Mor's rejection of the limited partnership agreement would not resolve its perceived conflict of interest, so Phar–Mor's perceived "indirect" benefits from rejection would not really occur.

In sum, this court finds it must remand this case to the bankruptcy court for a determination of whether the PMCA–LP limited partnership agreement will benefit the estate as required by the functional approach laid out in *Jolly* and the other cases cited above. This court holds as a matter of law that substantial obligations remain to be performed under the contract. The bankruptcy court must now determine whether rejection can "serve[ ] the purpose of making the debtor's rehabilitation more likely" through "reliev[ing] the estate of a burdensome con-

7. The *Norquist* court "suggested that a partnership agreement would be an executory contract if it applied a 'results' oriented test similar to that adopted by the Court of Appeals for the Sixth Circuit." *In re Cardinal Inds., Inc.,* 116 B.R. 964, 973 n. 1 (Bankr.S.D.Ohio 1990) (citing *Jolly* ).

8. For example, Pennsylvania law—which governs the PMCA–LP limited partnership agreement—states that a court may dissolve a part-

nership if one partner "so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him." 15 Pa.C.S.A. § 8354(a)(4). Indeed, partners stand in a fiduciary relationship, owing to each other "the duty of the finest loyalty." *Clement v. Clement,* 436 Pa. 466, 260 A.2d 728, 729 (1970). This duty continues during the entire course of the partnership.

tract." *City of Covington v. Covington Landing L.P.,* 71 F.3d 1221, 1227 (6th Cir. 1995) (quoting *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1310 (5th Cir.1985)); *Norquist,* 43 B.R. at 225. This determination must be done in light of not only the extent of Phar–Mor's remaining obligations explicitly set out under the contract, but also the nature of any other benefits Phar–Mor might enjoy if it avoids the contract. As noted above, these benefits may be different from merely avoiding its concrete contractual obligations. For example, it might include the possible benefit of merely severing its ties to partners that it might have good reason to believe failed to "pursu[e] a common goal and not work[ ] at cross-purposes." *Clement,* 260 A.2d at 729.

Because Phar–Mor's objections are well-taken, the bankruptcy court's determination that Phar–Mor may not reject the PMCA–LP limited partnership agreement pursuant to 11 U.S.C. § 365 is reversed. This case is remanded to the bankruptcy court for further proceedings consistent with this opinion. Specifically, the bankruptcy court must determine, in light of this court's finding as a matter of law that substantial obligations remain to be performed under the PMCA–LP limited partnership agreement, whether Phar–Mor's rejection of the agreement might reasonably benefit the estate under the functional approach.

### IV.

"Additionally and alternatively" to its motion seeking authority under 11 U.S.C. § 365 to reject the PMCA–LP limited partnership agreement, Phar–Mor "[sought] relief to amend the Partnership Agreement, with the requisite consent of the limited partners, under 11 U.S.C. § 363(b)(1)." Bankruptcy Order at 1. The bankruptcy court denied this motion, noting that "the Sixth Circuit has generally held that courts should not rewrite a contract or add or delete provisions." *Id.* at 9–10.

■ This court finds the bankruptcy court's analysis on this issue well-reasoned and free of error. Indeed, the Sixth Circuit has recently reaffirmed its position on this question. Absent agreement between the contracting parties, a debtor who assumes an executory contract "must assume both the benefits and the burdens," and a court "may not excise material obligations owing to the non-debtor contracting party." *Covington,* 71 F.3d at 1226.

Accordingly, the bankruptcy court's order denying Phar–Mor's motion to amend the partnership agreement is affirmed. This affirmance, however, does not limit the bankruptcy court from revisiting the issue in light of any further proceedings on remand.

IT IS SO ORDERED.