**In re SIMON TRANSPORTATION SERVICES, INC., Dick Simon Trucking, Inc., and Simon Terminal, LLC, Debtors.**

No. 02–22906.

United States Bankruptcy Court, D. Utah.

April 25, 2003.

L. Mark Ferre, Weston L. Harris, Parsons Davies Kinghorn & Peters, Salt Lake City, UT, Mark A. Thornhill, Scott J. Goldstein, Spencer, Fane, Britt & Browne, LLP, Kansas City, MO, for debtor.

Peter W. Billings, Jr., Fabian & Clendenin, Steve P. Young, Holme Roberts & Owen, Salt Lake City, UT, Mark S. Swan, Richer Swan & Overholt, South Jordan, UT, for Unsecured Creditors Committee.

## ORDER DENYING MOTION TO RECONSIDER

GLEN E. CLARK, Chief Judge.

On October 21, 2002, the Court denied, without prejudice, a Supplemental Motion to Assume and Assign filed by Simon Transportation Services Inc., a Nevada corporation, Dick Simon Trucking, Inc., a Utah corporation, and Simon Terminal, LLC, an Arizona limited liability company (collectively referred to as "Simon"), and ruled that certain trade-back agreements were not marketed, sold or assigned as a part of a sale approved by an Order entered April 22, 2002 (the "Sale"), that the trade-back agreements were executory in nature, and that the Unsecured Creditors' Committee was to auction the trade-back agreements to the highest bidder. The Court's ruling of October 21, 2002, was reduced to writing and entered on December 3, 2002 (docket # 852), a timely motion to reconsider was granted, and the hearing to reconsider was conducted on January 17, 2003, February 10, 2003, and February 12, 2003.

At the hearing to reconsider, Central Refrigeration Services, Inc., ("Central") was represented by Michael N. Emery and Wayne Z. Bennett of Richards, Brandt, Miller & Nelson; Freightliner Corporation and Freightliner Market Development Corporation (collectively referred to as "Freightliner") was represented by J. Thomas Beckett and Dianna M. Gibson of Parsons, Behle & Latimer; Simon was represented by Weston L. Harris of Par-

sons, Davies, Kinghorn & Peters; and the Unsecured Creditors' Committee was represented by Peter W. Billings, Jr., of Fabian & Clendenin. Extensive evidence was introduced and argument of counsel was presented. Based thereupon, and the pleadings filed, the Court now issues the following ruling.

### Facts

Simon was one of the nation's largest temperature-controlled motor carriers with more than 2,300 tractors and 3,300 trailers, many of which were leased or financed. In September 2000, Simon was acquired by Jerry Moyes ("Moyes") through the acquisition of a controlling interest in Simon's common stock.

On the petition date, Simon owned approximately 461 trade-back agreements (the "Trade–Back Agreements") with Freightliner. Trade–Back Agreements were often negotiated by Simon as a part of the purchase agreement when Simon acquired new trucks from Freightliner. The Trade–Back Agreements gave Simon an option to trade in a used Freightliner truck at a favorable price when purchasing new equipment from Freightliner. Most of the Trade–Back Agreements have a non-transferability clause that restricts their assignment to a third party. The Trade–Back Agreements require Simon to maintain the used trucks to certain agreed specifications[1] and require Freightliner to repurchase used trucks at a price equal to 55 percent of their original purchase. Simon is under no contractual obligation to exercise the Trade–Back Agreements other than realizing the benefit of the bargain struck with Freightliner at the time the Trade–Back Agreements were negotiated. The price set for a used truck in the Trade–Back Agreements is significantly higher than the current market price for a used truck, making the Freightliner Trade–Back Agreements, in aggregate, worth up to $4.1 million.

On March 11, 2002, with little or no prospect for a successful reorganization, Simon filed a motion to approve the sale of substantially all of its assets and to approve assumption and assignment of leases and executory contracts ("Sale Motion"). The Sale Motion sought to utilize an initial offer proposed by Central as a "Stalking Horse" bid intended to be "shopped around" to attract higher offers. Central, a corporation controlled by Moyes, was organized for the purpose of acquiring the assets of Simon through this sale. The Sale Motion sought an expedited schedule for the marketing and sale because Simon reported operating losses of $100,000 per day and was on the verge of exhausting its operating capital.

The Sale Motion described an active marketing effort that would provide a competitive bidding and auction process with adequate notice to all creditors and parties in interest.

A "Term Sheet" describing the assets to be sold and the terms of the contemplated sale was attached to the Sale Motion. Paragraph 4 of the Term Sheet stated that Simon will sell or assign to the buyer all of "the debtors' rights" in the conditional commitment to repurchase agreements, letters and similar "buybacks" or "trade-back" agreements. The Term Sheet contains no information[2] concerning the num-

---

1. Failure of Simon to tender the used trucks in accordance with the agreed specifications would constitute a material breach excusing performance of Freightliner.

2. The Trade–Back Agreements are mentioned in paragraph 8 of the Term Sheet wherein the Trade–Back Agreements are lumped with intangible and business record property which is to be purchased as a group for the allocated

ber of Trade–Back Agreements involved, no description of the terms or conditions of the Trade–Back Agreements, no estimate of the value of Trade–Back Agreements, and no discussion to inform a prospective bidder of the possibility that under the bankruptcy laws the Trade–Back Agreements may be assigned to the successful bidder notwithstanding any non-transferability clause.

Morgan Keegan & Company, Inc., ("Morgan Keegan"), an investment banking firm specializing in mergers and acquisitions involving transportation and logistics companies, was selected by Simon to market its proposed sale. One of the principal tools utilized by Morgan Keegan in its efforts to promote the sale was a "Confidential Memorandum," a lengthy document intended to provide detailed financial information about Simon's business and assets for use by prospective bidders. The Confidential Memorandum describes the Trade–Back Agreements in the following way:

> A substantial portion of the Company's tractor fleet is covered by trade-in and repurchase agreements with the manufacturer. The trade-in and repurchase agreements require the Company to purchase additional tractors in connection with the trade-ins or repurchases. . . .

There is no disclosure of the Trade–Back Agreements' estimated value [3], nor is there any mention of the possibility that, under the Bankruptcy Code, the Trade–Back Agreements may be assigned to a third party notwithstanding a non-transferability clause.

On March 21, 2002, ten days after filing the Sale Motion, Simon's bankruptcy Schedules and Statements were filed with the Court (docket # 188). Simon's Schedule B—Personal Property consists of over 300 pages. There is nothing in the 300 pages of Simon's Schedule B that discloses or discusses the existence of the Trade–Back Agreements nor is there an estimate of the value of the Trade–Back Agreements.[4]

Simon's Schedule G—Executory Contracts lists a total of eight executory contracts. None of the executory contracts disclosed on Schedule G are the Trade–Back Agreements.

On March 22, 2002, the Court granted an Order establishing auction procedures and notice requirements ("Auction Procedures Order") with respect to Simon's Sale Motion. The Auction Procedures Order, among other things, named Central as the "Stalking Horse" bidder, set March 25, 2002 as the date by which Central's Asset Purchase Agreement ("Asset Purchase Agreement") should be filed with the Court, required that Simon use its best efforts to accommodate all requests for reasonable due diligence prior to the sale hearing, set a bid deadline for prospective bidders of April 5, 2002, and required that Simon provide notice of the proposed bid-

---

sum of S2.0 million. No information regarding the value of individual items of intangible property is provided.

**3.** The Confidential Memorandum describes assets such as: Service Vehicles valued at $200,000, Shop Equipment valued at $600,000, Fontana Terminal valued at $1.5 million, Atlanta Terminal valued at $2.9 million and Office Furniture and Equipment valued at $3.2 million but does not mention that

the Trade–Back Agreements that may have a value up to $4.1 million.

**4.** The detail provided in Simon's schedule B goes to the point of disclosing "building permits" issued in September of 2001 (at pages 1 and 119), valued at zero, $800, $200 or $600 depending upon ones interpretation of Simon's Schedules, but yet no mention of the Trade–Back Agreements.

ding, auction, and sale to all creditors, parties in interest, and to all parties to executory contracts and leases.

It is undisputed that notice of the proposed sale was not sent specifically to Freightliner Corporation or to Freightliner Market Development Corporation.

On March 25, 2002, Central filed its Asset Purchase Agreement with the Court, but it did not disclose the existence or the value of the Trade–Back Agreements. The schedules attached to the Asset Purchase Agreement were blank. The Asset Purchase Agreement at paragraph 9.18 indicates that the Asset Purchase Agreement was filed without schedules and that the schedules shall be filed with the Court no later than April 3, 2002. Paragraph 9.17 states that time is of the essence.

In an effort to promote the sale, Morgan Keegan established a document room to facilitate due diligence of prospective bidders in preparing competitive bids for Simon's assets. Frozen Foods Express Industries, Inc., ("Frozen Foods") was the only prospective bidder to send a team to visit the document room.

Robert Goates, Chief Financial Officer of Simon, issued a letter dated April 2, 2002[5] to F. Dixon McElwee, Jr., Chief Financial Officer of Frozen Foods, in response to a due diligence inquiry made by Frozen Foods (Central exhibit "O"). The letter, at page one, in reference to Item 11 states that: "None of the trade-in or buy-back agreements have been renegotiated.

However, we are provid[ing] you a copy o[f] all existing agreements." The letter fails to mention the possibility that under the Bankruptcy Code, Simon may assume and assign the Trade–Back Agreements to a third party notwithstanding the Trade–Back Agreements' non-transferability clauses. The omission is significant[6] because without that information, Frozen Foods would likely assume that the Trade–Back Agreements would not be readily assignable and therefore of little value.

It is generally understood within the trucking industry that a trade-back agreement cannot be assigned to a third party unless it has been renegotiated between the original buyer and the manufacturer.

On April 4, 2002, one day before the bid deadline,[7] Central filed its supplement to the Asset Purchase Agreement (docket # 319). The Supplement to Central's Asset Purchase Agreement included Schedule 2.1(g)—"Assumed Contracts" which identifies Freightliner and Freightliner Market Development as parties to assumed contracts.

On April 5, 2002, competitive bidding in conjunction with the Sale Motion closed.

On April 8, 2002, at the hearing on the Sale Motion, because no other qualified bids were submitted, the Court orally approved the sale of substantially all assets to Central for $51 million.

---

**5.** By April 2, 2002, as the only prospective bidder to visit the document room, Frozen Foods was Simon's best chance to engender a competitive bidding situation with Central.

**6.** Because the Auction Procedures Order specifically directed Simon to accommodate all requests for reasonable due diligence prior to the sale hearing, Simon should have provided all of the material facts concerning the Repurchase Agreements to Frozen Foods once Frozen Foods made an inquiry about the Trade–

Back Agreements. The possibility that the Repurchase Agreements may be assigned to the winning bidder notwithstanding any non-transferability clause is a material fact.

**7.** The supplement was filed one day late according to paragraph 9.18 of the Asset Purchase Agreement which stated that the supplement would be filed no later than April 3, 2002.

On April 9, 2002, Central and Simon filed a joint motion to assume and assign certain contracts under 11 U.S.C. § 365. The Freightliner Trade–Back Agreements were among the contracts listed to be assumed and assigned to Central in the joint motion.

On April 19, 2002, Simon's amended bankruptcy Schedules were filed with the Court (docket # 404). Simon's amended Schedules contain no amendments of Schedule B. Amended Schedule G—Executory Contracts lists over 500 executory contracts including customer contracts and re-assignment information. The Trade–Back Agreements were not disclosed in debtor's amended Schedule G.

On April 22, 2002, the Court entered the Order [8] authorizing the sale of substantially all of Simon's assets to Central (the "Sale Order"). The specific language of the April 22, 2002, Order went beyond the language set forth in the proposed order filed with the Sale Motion on March 11, 2002, and went beyond the terms as stated on the record at the hearing on the Sale Motion of April 8, 2002. The April 22, 2002, Order included language that specifically assumed and assigned the Trade–Back Agreements to Central prior to the ten days' notice to the counterparty of the agreement, and without providing the

counterparty to the agreement an opportunity to object.

With the Sale of assets from Simon to Central, both of which are controlled by Moyes, the business operations of Simon transferred to Central. John Isaacson, the CEO of Simon, became the CEO of Central. Robert Goates, the CFO of Simon, became the CFO of Central. Mark Wilke, general counsel for Simon, became general counsel for Central. Most of the administrative staff of Simon became administrative staff for Central, and the headquarters of Simon, became the headquarters of Central.

On May 2, 2002, Freightliner appealed the Sale Order and filed a motion to reconsider [9] arguing that no notice was given to Freightliner or anyone else of the assumption and assignment of the Repurchase Agreements, that the failure to give proper notice was calculated to prevent Freightliner from objecting, and the Sale Order should exclude the Freightliner commitments entirely from the effects of the Order.

Freightliner's motion to reconsider came before the Court on June 4, 2002, at which time Freightliner and Simon represented to the Court that a stipulation was reached between the parties to extend the time for

---

**8.** The Order (docket # 407), which is 32 pages long with 568 pages of exhibits, provides, among other things, that certain contracts granting debtors "buyback" or "tradeback" rights with respect to Freightliner LLC, Freightliner Corporation and Freightliner Market Development Corporation are all to be assumed and assigned by the Debtors to the purchaser, that the provisions of §§ 365(b)(1) and 365(f) of the Bankruptcy Code are deemed satisfied, that equipment leases and buyback agreements shall, upon assignment to the purchaser, be deemed to be valid and binding and in full force and effect and enforceable, that no cure amounts are necessary to cure any defaults under the buyback agreements under §§ 365(b)(1) and 365(b)(1)(B) of

the Bankruptcy Code, and that purchaser has provided adequate assurance of the purchaser's future performance under the buyback agreements within the meaning of §§ 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

**9.** The complete title of Freightliner's motion filed on May 2, 2002, as docket # 453 is: Motion for (I) Reconsideration of April 22, 2002 Orders Authorizing Sale, Etc. and Approving Assumption and Assignment of Executory Vendor Contracts, Etc., and (II) Exclusion of the Freightliner Companies From the Effects of Those Orders.

discovery and that the motion would be continued without a date.

On July 19, 2002, Simon filed a supplemental motion to assume and assign the Freightliner contracts [10] ("Supplemental Motion to Assign"), but did not notice a hearing on its motion.

On July 26, 2002, KPMG LLP issued an Independent Auditor's Report ("Audit Report"), stating that it had conducted an audit in accordance with auditing standards generally accepted in the United States of America concerning Central's balance sheet as of April 22, 2002.

Neither the balance sheet nor the Auditor's Report mentioned the Trade–Back Agreements or their value.

On August 27, 2002, an agreed Order [11] ("Agreed Order") granting motion for reconsideration of the April 22, 2002, Order was entered. The Agreed Order, which was approved as to form by Central, Freightliner, Simon and the Unsecured Creditors' Committee states as follows:

> The Motion for Reconsideration of this Court's April 22, 2002 Order Pursuant to §§ 105(a), 363, 365 and 1146 of the Bankruptcy Code: (A) Authorizing the Sale of Substantially all of the Debtors' Assets to Central Refrigerated Service, Inc. Free and Clear of Liens, Claims, Interests and Encumbrances; (B) Approving the Asset Purchase Agreement; and (C) Granting Related Relief (the "Sale Order") is hereby granted and the

Freightliner Companies and all agreements to which they are a party with the Debtors are excluded entirely from the effects of the Sale Order.

The Agreed Order to had the effect of entirely excluding all Freightliner agreements, including the Repurchase Agreements from the effects of the Sale Order.

On September 4, 2002, Central filed a notice of hearing on Simon's Supplemental Motion to Assign. The hearing ultimately came before the Court on October 21, 2002.

At the October 21, 2002, hearing on Simon's motion, the Court denied Simon's motion, without prejudice, and ruled that the Trade–Back Agreements were not included in the Sale Order, that the Trade–Back Agreements were executory in nature, and that the Trade–Back Agreements were to be auctioned by the Unsecured Creditors' Committee.

The Court's ruling of October 21, 2002, was reduced to writing and entered on December 3, 2002 (docket # 852). A timely motion to reconsider was filed by Central and granted by Order entered December 20, 2002.

At the hearings to reconsider of January 17, 2003, February 10, 2003 and February 12, 2003, Central argued that it paid Simon for the Trade–Back Agreements when it purchased substantially all of Simon's assets for the price of $51 million and that

---

10. The complete title of Simon's motion filed July 19, 2002, as docket # 641 is: Debtors' Supplemental Motion to Assume and Assign (1) Agreement between Dick Simon Trucking and Freightliner, (2) Agreement for Conditional Commitment to Repurchase # 2000–00366, (3) Agreement for Conditional Commitment to Repurchase # 2001–00013 and (4) Agreement for conditional Commitment to Repurchase # 2001–00014 pursuant to 11 U.S.C. § 365.

11. The complete title of the agreed Order (docket # 710) is: Agreed Order Granting Motion for Reconsideration of April 22, 2002 Order Pursuant to §§ 105(A), 363, 365 and 1146 of the Bankruptcy Code: (A) Authorizing the Sale of Substantially All of the Debtors' Assets to Central Refrigerated Service, Inc. Free and Clear of Liens, Claims, Interests and Encumbrances; (B) Approving the Asset Purchase Agreement; and (C) Granting Related Relief.

for that reason, Central is now entitled to assignment of the Trade–Back Agreements without further consideration. Freightliner argued that Central paid nothing for the Trade–Back Agreements in conjunction with the April 22, 2002 Order and that if the Court should find the Trade–Back Agreements to be executory contracts, Freightliner is entitled to adequate assurances of future performance in the form of a bond of $150 million because the cost to exercise the Trade–Back Agreements, including the purchase of new equipment, will equal that amount.

At the hearings of January 17, 2003, February 10, 2003, and February 12, 2003, the Court heard expert testimony offered by Freightliner concerning Central's balance sheet. The testimony focused on the requirements of two Financial Accounting Standards ("FAS") promulgated by the Financial Accounting Standards Board of the Financial Accounting Foundation. The two FAS applicable to Central's balance sheet dated April 22, 2002, are FAS 141 which requires that intangible assets acquired by Central be carried on the balance sheet at fair market value or at management's best estimate of the fair market value, and FAS 142 which requires, at a minimum, that all intangible assets be aggregated and presented as a separate line item on the balance sheet.

Central's balance sheet dated April 22, 2002, does not mention the Trade–Back Agreements, does not value the Trade–Back Agreements, does not carry the Trade–Back Agreements as a separate line item or as part of aggregated intangibles, nor is there any reference of the Trade–Back Agreements in the footnotes to the balance sheet or the Audit Report.

Because Central's balance sheet does not comply with the requirements of FAS 141 and 142, Freightliner's expert concluded that Central paid nothing for the Trade–Back Agreements.

### Discussion

To resolve this controversy, the Court must address two separate issues: 1) Is approval of Simon's Supplemental Motion to Assign in the best interests of the estate because Central paid for the Trade–Back Agreements at the time of the Sale? and 2) Are the Trade–Back Agreements executory contracts within the meaning of 11 U.S.C. 365? The Court will take up the issues in that order.

### Supplemental Motion to Assign

Simon's Supplemental Motion to Assign seeks authority to assume and assign the Trade–Back Agreements to Central. Freightliner argues that the assignment to Central is not in the best interests of the estate because Central paid nothing for the Trade–Back Agreements.[12] Central responds that it paid for the Trade–Back Agreements as a part of the Sale. If consideration was paid by Central for the Trade–Back Agreements as a part of the Sale, the Court should approve the Motion. If no consideration were paid by Central for the Trade–Back Agreements, the Court should deny the Motion as not being in the best interests of the estate.

Because ruling that Central paid nothing for the Trade–Back Agreements, when combined with the effect of the Agreed Order, will be tantamount to setting aside the Sale Order with respect to the Trade–Back Agreements, the Court will approach

---

**12.** Because the Agreed Order signed by the Court on August 27, 2002, excludes the Trade–Back Agreements entirely from the effects of the Sale Order, the Court need not consider setting aside the Sale Order, but must determine if Central paid for the Trade–Back Agreements as a part of the purchase price of the Sale.

the issue as though it is being asked to set aside a sale order.

■ The Sale was based on a competitive bidding process utilizing Central, an insider, as a stalking horse to attract higher bidders. When an insider is used as a stalking horse in a bankruptcy sale, the debtor must show that a sound business reason exists for the sale, that there has been adequate and reasonable notice to interested parties including full disclosure of the sale terms, that the sale price is fair and reasonable, and that the proposed buyer is proceeding in good faith. *In re Medical Software Solutions*, 286 B.R. 431 (Bkrtcy.D.Utah 2002). If Simon did not fully disclose all terms of the sale, and in particular, the terms and value [13] of the Trade–Back Agreements, then the value of the Trade–Back Agreements would not have been a part of the competitive bidding process of the Sale and Central would have paid nothing for the Trade–Back Agreements.

■ When considering setting aside a sale to an insider, the Court must rigorously scrutinize all of the facts and circumstances surrounding the sale. *Mid–Town Produce Terminal, Inc. v. Barr*, 599 F.2d 389 (10th Cir.1979) (Because there is an incentive and opportunity to take advantage, dominant shareholders in a bankruptcy situation are subject to special scrutiny regarding their transactions with the debtor corporation). The burden is upon the proponent of a sale between corporations having common board members to show the sale's entire fairness and to show that the sale involved full adequacy of consideration. This is especially true where a common director is dominating in influence. *Geddes v. Anaconda Copper*

*Mining Co.*, 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425 (1921).

■ "A court of equity may set aside an order of sale either before or after confirmation when it appears that the same was entered through mistake, inadvertence, or improvidence." *Webster v. Barnes Banking Co.*, 113 F.2d 1003, 1005 (10th Cir.1940). Where the notice of the sale is insufficient, a confirmed sale will be set aside. *Mason v. Ashback*, 383 F.2d 779 (10th Cir.1967). Although *Smith v. Juhan*, 311 F.2d 670 (10th Cir.1962) requires a showing that shocks the conscience in order to set aside a sale based solely upon an inadequate sales price, such a standard is not required to set aside a sale where fraud, accident, mistake or any other cause for which equity would avoid a sale is shown. *In re BCD Corporation*, 119 F.3d 852 (10th Cir.1997) (sale set aside where the terms upon which the parties thought they were bidding turned out not to be the terms of the sale which were ultimately proposed to the court).

■ Much of the evidence before the court addresses the marketing and the disclosure of the Trade–Back Agreements leading up to the Sale. Moyes, the control person of Simon, held the power to control Simon's marketing efforts and the power to disclose Simon's assets. A failure to disclose the existence of assets, even through inadvertence, discourages competing bids and operates to the advantage of Moyes the control person of Central. In a bankruptcy setting, a dominant or controlling shareholder "cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power

---

**13.** The value of the Trade–Back Agreements in the eyes of a prospective bidder is a function of the price set for the buy back of used trucks, the market value of used trucks, the number of trucks covered by the Trade–Back Agreements, and whether or not the Trade–Back Agreements are assignable to the successful bidder.

may be and no matter how meticulous he is to satisfy technical requirements." *Pepper v. Litton*, 308 U.S. 295, 311, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

■ Mere references to the Trade–Back Agreements in the Term Sheet, the Asset Purchase Agreement and the Confidential Memorandum without more, do not suffice to put potential bidders in a position where they can competitively bid against an insider such as Moyes. Prospective bidders had almost no way of knowing that the Trade–Back Agreements were with Freightliner until one day before the bid deadline when Exhibit 2.1(g) to the Asset Purchase Agreement was filed with the Court, and were never given information that the Trade–Back Agreements may be worth up to $4.1 million. In fact, no estimated value of the Trade–Back Agreements was ever disclosed. This may stem from the fundamental problem created by Simon's failure to disclose the Trade–Back Agreements in its bankruptcy Schedules or Statements.

The reference to "the debtors' rights" to the Trade–Back Agreements found in the Term Sheet would logically lead a prospective bidder to examine Simon's Schedules and Statements for a full disclosure of exactly what those "rights" were and their estimated value. Because Simon did not disclose the existence or value of the Trade–Back Agreements in its Schedules and Statements, the reference to "the debtors' rights" to the Trade–Back Agreements in the Term Sheet is a meaningless reference and does nothing but create confusion. To make matters worse, references to the Trade–Back Agreements in the Confidential Memorandum seem to characterize them as a liability rather than an asset.

The final blow comes with the letter dated April 2, 2002, from Robert Goates, CFO of Simon addressed to the CFO of Frozen Foods, a prospective bidder. Rather than encouraging Frozen Foods to aggressively bid at the auction by disclosing that the Trade–Back Agreements may be of significant value and, under bankruptcy law, may be assignable to the successful bidder notwithstanding the non-transferability clauses, the letter essentially dismisses the Trade–Back Agreements by stating that they have not been renegotiated. The letter of April 2, 2002, treads dangerously close to fraudulent nondisclosure. *Hermansen v. Tasulis*, 48 P.3d 235 (Utah 2002).

With respect to the April 9, 2002, motion to assume and assign, if the Trade–Back Agreements were sold and assigned as a part of the Sale Order, the motion [14] to assume and assign filed on April 9, 2002, makes no sense. The April 9, 2002, motion tends to negate any argument that it was always Simon's intention to sell and assign the Trade–Back Agreements to Central as part of the Sale. The very existence of the April 9, 2002, motion weighs against the Trade–Back Agreements ever being a part of the Sale and weighs against any argument that Central believed that it was purchasing and paying for the Trade–Back Agreements as a part of the Sale.

The fact that Central's balance sheet dated April 22, 2002, and the Audit Report: (1) do not mention or disclose the existence of the Trade–Back Agreements; (2) assign no fair market value or estimated value for the Trade–Back Agreements; (3) contain no line item to reflect the acquisition of the Trade–Back Agreements; and (4) contain no footnotes discussing the Trade–Back Agreements, weighs against the Trade–Back Agreements ever being a

**14.** The April 9, 2002, motion was filed over four months prior to the Agreed Order which had the effect of excluding the Trade–Back Agreements from the Sale.

**218**

part of the Sale and against any argument that Central believed that it was paying for the Trade–Back Agreements.

The cumulative effect of this series of non-disclosures and partial disclosures put prospective bidders at a distinct disadvantage and put Moyes, the control person of Central and Simon, in a position of significant advantage in the bidding process by causing the perceived value of Simon's business to be as much as $4.1 million less than the actual value of the business. A $4.1 million sum that Central did not have to pay to outbid the competition.

■■■ "A debtor in a bankruptcy proceeding is required to disclose all property owned at the commencement of the case." *United States of America v. McIntosh,* 124 F.3d 1330, 1335 (10th Cir.1997). A debtor in possession, like a bankruptcy trustee, is a fiduciary and must be depended upon to carry out its fiduciary responsibilities. *In re Americana Expressways, Inc.,* 133 F.3d 752 (10th Cir.1997). It is a basic principal that a debtor in possession must never give an insider a competitive advantage over others with regard to matters affecting the administration of its bankruptcy estate. "Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation." *Pepper,* 308 U.S. at 311, 60 S.Ct. 238.

The failure to disclose and market, whether it occurred because of fraud, accident or mistake, caused a fundamental defect in the bidding process that resulted in a winning bid submitted by Central that paid nothing for the Trade–Back Agreements. Accordingly, Simon's Supplemental Motion to Assume and Assign will be

denied as not in the best interests of the estate.

### Executory Contract

■■■ Freightliner argues that because the Trade–Back Agreements are options, they are not executory contracts [15] and cannot be assigned under § 365. Freightliner cites to Professor Countryman's definition of an executory contract which states that an executory contract is "a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Vern Countryman, Executory Contracts in Bankruptcy: Part 1,* 57 Minn. L.Rev. 439, 460 (1974). An option binds only one of the two parties to perform under the contract. The party with the option holds rights that may be of significant value, but cannot be compelled under the terms of the contract to exercise the option. *In re Riodizio, Inc.,* 204 B.R. 417 (Bankr. S.D.N.Y.1997). Under a strict reading of the Countryman definition, an option is not an executory contract.

Some courts have adopted the Countryman approach ruling that options are not executory contracts. *In re Robert L. Helms Constr. & Dev. Co., Inc.,* 139 F.3d 702 (9th Cir.1998); *In re Nat'l Financial Realty Trust,* 226 B.R. 586 (Bankr. W.D.Ky.1998); *In re America West Airlines, Inc.,* 179 B.R. 893 (Bankr.D.Ariz. 1995). Other courts have adopted a "functional approach" wherein the court looks to the benefits to be gained by the debtor's estate to determine if a contract is executory or not. *In re General Development*

**15.** Although the Court has denied Simon's Supplemental Motion to Assign, the question of whether or not the Trade–Back Agreements are executory remains an issue because the

Order entered December 3, 2002, in part, directs the Unsecured Creditors' Committee to auction the Trade–Back Agreements.

*Corp.,* 84 F.3d 1364 (11th Cir.1996); *In re Jolly,* 574 F.2d 349 (6th Cir.), *cert, denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978); *Phar–Mor, Inc. v. Strouss Building Assocs.,* 204 B.R. 948 (N.D.Ohio 1997); *In re Seymour,* 144 B.R. 524 (Bankr. D.Kan.1992). Under the functional approach, the Trade–Back Agreements would likely be executory contracts.

Although it has not ruled squarely on this issue, the Tenth Circuit, in *dicta,* indicates that it would likely find an option to be an executory contract for purposes of 11 U.S.C. § 365. In *In re Durability Inc.,* 212 F.3d 551 (2000), the Tenth Circuit ruled that the question of whether a key man life insurance policy is an assumable executory contract turns on whether the contract terminated before bankruptcy was filed. The facts in *Durability* suggest that if an insurance policy is in force on the petition date, it is an assumable executory contract. The holder of an insurance policy is under no obligation to continue paying on the policy and always has the option to cease paying and allow the policy to lapse, just like Simon has the option to exercise the Trade–Back Agreements or allow them lapse.

For additional guidance, the Court will look to two areas of the law relating to the factual issues before the Court: (1) the economic realities of commercial contracts, and (2) options as executory contracts.

***Economic Realities.*** Although Simon is not contractually bound to exercise the Trade–Back Agreements, the economic realities of the situation demand that Simon either exercise the Trade–Back Agreements [16] or assign the Trade–Back Agreements to a third party [17] who will pay Simon for the assignment of the Trade–Back Agreements. The Tenth Circuit recognizes the importance of this concept and will recharacterize a lease with option to purchase into an installment sales contract where the economic realities of the situation so warrant. *See, In re Fashion Optical, Ltd.,* 653 F.2d 1385 (10th Cir.1981) (the fact that the parties subjectively viewed their transaction as a lease does not make a true lease of what economic realities might show to be a secured installment sale). See also, *United States ex rel. Eddies Sales and Leasing, Inc. v. Federal Ins. Co.,* 634 F.2d 1050 (10th Cir. 1980) (equipment lease with a purchase option at termination that required no more than a nominal sum was a secured installment sale and not a lease with option); *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,* 532 F.2d 166 (10th Cir.1976) (if the terms of a lease with option are such that the only sensible course of action for lessee is to exercise the option, the lease will be treated as an installment sale and not as a lease with option). Under the circumstances of this

---

**16.** It is irrelevant to argue that Simon lacks the financial ability to redeem the Trade–Back Agreements because Simon can still obtain the benefit of its bargain with Freightliner by assigning the Trade–Back Agreements to a third party which has purchased the relevant vehicles.

**17.** The Court sees no need for adequate assurance of future performance. Freightliner alleges no breach in the contract. The Trade–Back Agreements themselves contemplate a contemporaneous exchange creating no reliance by either party. If the Trade–Back

Agreements are exercised by presenting a qualifying used truck and payment for the new truck purchase, there will have been complete performance. If the Trade–Back Agreements are not exercised or if Simon's assignee presents a used truck that fails to meet all specifications, or if payment for the new truck purchase cannot be tendered, then Freightliner will be excused from performance and will enjoy a significant economic benefit. Freightliner needs no bond to protect against Freightliner enjoying a significant economic benefit.

case, it is likely that the Tenth Circuit would find the Trade–Back Agreements to be executory contracts, because the economic realities of the situation turn the options into obligations. Exercising the Trade–Back Agreements is the only sensible course of action available to Simon. Viewed in such a way, the Trade–Back Agreements fall within the definition of executory contracts even under the Countryman approach.

***Options as Executory Contracts.*** It appears that the Utah State Supreme Court would find that the Trade–Back Agreements to be executory contracts. In *Harper v. Great Salt Lake Council, Inc.,* 976 P.2d 1213 (1999), the Utah State Supreme Court refers to an earnest money agreement for the purchase of land as an executory contract. *See also, Imlay v. Gubler,* 77 Utah 547, 298 P. 383 (1931). Similar to Simon, a party who has made an earnest money offer holds an option, it may either go forward with the purchase or walk away from the contract and forfeit the earnest money.

It appears that the United States Supreme Court would find the Trade–Back Agreements to be executory contracts. The United States Supreme Court has characterized an option for the purchase of land as an executory contract. In *Villa v. Rodriguez,* 12 Wall. 323, 79 U.S. 323, 338, 20 L.Ed. 406 (1870), the Court stated that "the contract gave them the option-it did not bind them-to buy at the time specified.... The doctrine invoked has no application where the rights of the vendee lie in an executory contract."

The concept that an option is an executory contract is reinforced in the case of *Mabry v. Johnson,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984), wherein the Court refers to a plea bargain agreement as an executory contract. The hallmark of a plea bargain agreement is that it cannot be enforced against the defendant until it has been approved by a court. The defendant always has the option to withdraw the plea agreement and face trial instead.

The Court even uses the ability of one party to opt out of a contract as the distinguishing feature between a contract and an executory contract. In *Central Tablet Manufacturing Co. v. United States,* 417 U.S. 673, 94 S.Ct. 2516, 41 L.Ed.2d 398 (1974) at FN7, the Court states that an "executory contract to sell is to be distinguished from a contract of sale. This distinction recognizes the significance of the point in time where the parties can no longer opt out of a transaction." Under the *Central Tablet* test, the Trade–Back Agreements easily fit within the definition of executory contracts.

This Court follows the Tenth Circuit Court of Appeals and the United States Supreme Court by adopting a definition of executory contract that is consistent with the above opinions and finds that the Trade–Back Agreements are executory contracts.

For the reasons set forth above, it is hereby:

ORDERED that the motion to reconsider this Court's ORDER entered December 3, 2002, is hereby denied; and it is further

ORDERED that Simon's Supplemental Motion to Assume and Assign is denied; and it is further

ORDERED that the Trade–Back Agreements are executory contracts within the meaning of 11 U.S.C. § 365; and it is further

ORDERED that no assurances of future performance are required; and it is further

ORDERED that the Unsecured Creditors' Committee shall sell or assign the

Trade–Back Agreements by such means as it deems appropriate.