**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 23 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MICHELE A. CAPRIN, JEFF T.
CAPRIN, ISAAC ARMSTRONG,
BRUCE BRINKERHOFF, CHARLES
CIOCCO, LOUIS DEVIVO, ELENA
DEVIVO, ELLEN DINAS, MICHAEL
EDSON, JASON HILSENBECK,
BRUCE KOESTER, TYRONE
MARTINEZ, JOHN PEIFFER,
BRENDA POMRENKE, KEITH
POMRENKE, LOUIS POMRENKE,
DON SEXTON, LENA SEXTON,
MELVIN VAN DUREN, GARY
WEICHERT, GEORGE WILKENS,
PAULA ZIEGENHAGEN, EILEEN
ZIEGENHAGEN, individually and on
behalf of all others similarly situated,

     Plaintiffs - Appellants,

v.

SIMON TRANSPORTATION
SERVICES, INC., RICHARD D.
SIMON, KELLE A. SIMON, and
ALBAN B. LANG,

     Defendants - Appellees.

——————————

SECURITIES AND EXCHANGE
COMMISSION,

     Amicus Curiae.

No. 01-4049
(D.C. No. 2:98-CV-863K)
(D. Utah)

## ORDER AND JUDGMENT [*]

Before **LUCERO** and **MURPHY**, Circuit Judges, and **ALLEY**,[**] Senior District Judge.

Jeff T. Caprin and Michele A. Caprin ("the Caprins") on behalf of themselves and investors who purchased Simon Transportation Service stock during the class period, appeal the district court's dismissal of their Private Securities Litigation Reform Act of 1995 claims against Simon Transportation Services[1] ("STS") and three of its corporate officers, Richard D. Simon, Kelle A.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Wayne E. Alley, Senior United States District Judge for the Western District of Oklahoma, sitting by designation.

[1] STS filed for bankruptcy protection February 25, 2002. STS's filing triggered an automatic stay of these proceedings, pursuant to 11 U.S.C. § 362(a)(1). We requested supplemental briefing from the parties regarding whether the automatic stay should also apply to the individual codefendants under the particular circumstances of this case. See Okla. Federated Gold & Numismatics, Inc., v. Blodgett, 24 F.3d 136, 141 (10th Cir. 1994). All parties agree that the automatic stay should not apply to the individual codefendants. Consequently, after reviewing the parties' submissions, we are satisfied that a ruling should issue as to the individual defendants.

With respect to STS, we note that its joint plan of liquidation was affirmed on March 11, 2003, In re Simon Transp. Servs., Inc., et. al., Nos. 02-22906, 02-

(continued...)

-2-

Simon, and Alban B. Lang ("the defendants").  The Caprins contend that the district court erred in dismissing their claims that the defendants omitted material facts regarding STS's source of income, operating expenses, and accounting practices from several public documents in violation of various securities laws and regulations.  They further argue that the district court erred in denying their motions to alter or amend the judgment and to amend the complaint to include proffered evidence.  STS's bankruptcy filing triggered an automatic stay of the proceedings in this court.  Following supplemental briefing by the parties and the affirmation of STS's bankruptcy plan, we exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **AFFIRM**.

## I

STS was a truckload carrier headquartered in West Valley City, Utah, that

---

[1](...continued)
22907, 02-24874, slip. op. at 6 (Bankr. D. Utah Mar. 11, 2003), and on March 22, 2003, STS ceased to exist.  See Appellant's Supp. Br., exh. D (Second Amended Joint Plan of Liquidation) (the "Plan"), at ¶ 6.2.  Although the liquidation plan denies discharge under 11 U.S.C. § 1141(d)(3), see Plan ¶ 6.6, the bankruptcy court's order confirming the liquidation plan enjoins "the commencement or continuation of an action, the employment of process, or an act to collect, recover or offset any pre-confirmation debt as a personal liability of the Debtors," with exceptions not relevant to the case before us.  In re Simon Transp. Servs., slip. op. at 6.  Our review of this language leads us to conclude that a dismissal, rather than a ruling on the merits, is appropriate as to STS.  The parties are free to call to our attention, in a petition for panel rehearing, any material facts regarding the status of STS, if such facts would change our conclusion dismissing STS in this matter.

specialized in refrigerated truckload transportation services.  Richard Simon founded the company in 1955 and STS issued its initial public stock offering in November 1995.  On February 13, 1997, STS conducted a secondary public offering based on several successive quarters of increased earnings.  The individual defendants in this suit sold approximately $11 million worth of stock in the secondary offering.

The Caprins allege both on appeal and to the district court that the registration statement filed pursuant to the secondary offering and the prospectus issued in conjunction with the registration statement were rife with material falsehoods and omissions.  For example, the Caprins contend that the defendants failed to report that STS encouraged drivers to exceed federal driving hour limits, failed to monitor the drivers' logs, and incorrectly stated that the company's operating supplies and expense ("OS&E") would decrease as newer equipment was used.

On January 15, 1998, slightly less than one year after the secondary public offering, STS issued a press release announcing that revenues and earnings for the fiscal[2] first quarter ("1Q'98") had improved from the previous year.  In addition, the press release included comments from Richard Simon concerning the purchase

---

[2] Simon's fiscal year ran from October to September.  Accordingly, the revenue and earnings announced in January 1998 for 1Q'98 consisted of revenue and earnings from October 1997 through December 1997.

of a terminal in Atlanta, a recent driver pay increase, and STS's efforts to raise customer rates in order to cover the pay increase. The Caprins claim that the rosy January press release camouflaged the falsehoods and misstatements alleged above.

Approximately one month later, on February 12, 1998, STS issued another press release, this time warning that revenues and earnings for the second quarter, ending March 31, 1998, and the fiscal year, ending September 30, 1998, were expected to fall substantially below earlier estimates. In the press release STS explained that while customer demand remained high, delays in tractor deliveries, a driver shortage, the recent driver wage hike, and increased costs from opening the new Atlanta terminal, combined to create a temporary impediment to STS's continued growth. The Caprins contend that while the January press release hid STS's problems, the February press release downplayed the true extent of these problems. Significantly, the Caprins assert, the individual defendants and three other Simon family members sold STS shares worth $3 million in the time period between these two public statements, while STS stock prices were still high, thus explaining why STS's press releases downplayed the true extent of STS's problems.

STS issued a third press release on April 2, 1998, announcing a $1.5 to $2.0 million net income loss for the second quarter of 1998 ("2Q'98") and stating that

-5-

revenues were expected to be $6.0 million below previous expectations. In this press release, STS explained that the shortfall was caused in part by insurance claim expenses resulting from an "unusually severe accident experience"; in addition, the previously announced driver wage increase had not been offset by increased freight rates as planned, and despite the wage increase, STS experienced a significant driver shortage in March.

In December 1998, the Caprins filed suit against the defendants for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder. They amended their complaint in June 1999 and again in December 1999, adding three new plaintiffs and claims under §§ 11, 12(2), and 15 of the Securities Act of 1933. The defendants filed a motion to dismiss for failure to state a claim and failure to plead fraud with particularity on March 24, 2000; the district court heard oral argument on the motion to dismiss and granted STS's motion pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) in an order dated September 27, 2000.

Subsequently, the Caprins filed a motion to alter or amend judgment based on newly discovered evidence. Denying the motion, the district court concluded that the newly discovered evidence was available earlier in the proceedings, and that the Caprins had not diligently attempted to discover it. The Caprins appeal to this court, arguing that the district court erred in dismissing their claims that

the defendants violated various sections of the Securities Act and Exchange Act. In addition, they argue that the district court erred in denying their motion to alter or amend the judgment and their motion to amend the complaint to include proffered evidence.

## II

We first determine whether the district court erred in finding that the one-year statute of limitations had expired for their Securities Act claims. We review the district court's determination that the Caprins' claims are barred by the statute of limitations de novo. Sterlin v. Biomune Sys., 154 F.3d 1191, 1194 (10th Cir. 1998). In our review, we accept all well-pleaded allegations in the complaint as true and construe them in the light most favorable to the plaintiff. Id. at 1195.

The Securities Act of 1933, 15 U.S.C. §§ 77a–z, regulates the sale of securities by requiring registration of the security with the SEC. This registration provides a potential investor with full and adequate disclosure of material information regarding the security. A registration statement and prospectus regarding a security is filed with the SEC before the security is offered for sale and the information contained therein is made available to the public. 15 U.S.C. § 77f and § 77j. Section 77k outlines liability for registration statements containing false or misleading material information or omitting material information; the section also provides a cause of action to any investor who

unknowingly purchases a security on the basis of false or misleading information in a registration statement. Section 77l(a)(2) provides that any person who sells a security by means of a prospectus containing false or omitted material information shall be liable to the purchaser of the security.

Claims under 15 U.S.C. § 77k or § 77l(a)(2), the sections under which the Caprins' Securities Act allegations arise, must be "brought within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. In Sterlin, we announced the two-part test for determining the limitations period for Securities Act claims: "inquiry notice triggers an investor's duty to exercise reasonable diligence and the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." Sterlin, 154 F.3d at 1201. Thus, a deciding court must determine: (1) the date of inquiry notice; and (2) the period in which a diligent investor should have discovered facts underlying the possible fraud. Evidence of the possibility of fraud, rather than particular details of the fraud, is all that is required to begin the limitations period. Id. at 1203. For example, in Sterlin we concluded that a published magazine article generally critical of a company's claims regarding its products was sufficient to put an investor on inquiry notice of the possibility of fraudulent activity. Id. at 1204. In

-8-

the proper circumstances, even rumors or vague charges would suffice to put a reasonable investor on notice of possible fraud. Id. at 1203–04. This court has described the facts sufficient to trigger inquiry notice as "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale [of the security]." Id. at 1196 (quotation omitted).

Directing the court's attention to several specific statements in the registration statement, the Caprins argue that "various hidden misconduct [i.e., the defendant's allegedly improper accounting] . . . rendered the financial statements in the secondary offering documents false and/or misleading," (Appellant's Opening Br. at 55–56), and that the defendants "had misrepresented to them the true nature and source of STS's operational problems," (Appellant's Reply Br. at 26), thus violating the Security Act.

Assuming without deciding that the Caprins' general accounting fraud allegations sufficiently pled that the registration statement or prospectus contained false or omitted material information, we must first determine if April 2, 1998, as the district court decided, is the correct date on which the Caprins were put on inquiry notice. At that point, the Caprins were aware of STS's serious financial problems; indeed, the Caprins concede that as early as the February 1998 press release, STS's financial results "shocked the market . . .[and

STS's] stock immediately tumbled." (Appellant's Opening Br. at 93 ¶7.) This lawsuit was first filed on December 3, 1998 by the Caprins, yet the original complaint did not include the Securities Act claims. The second amended complaint, which added three additional plaintiffs and included the Securities Act claims, was not filed until June 1999, over fourteen months after the date which the district court determined that the Caprins were on notice of the possibility of fraud.

Here, the complaint lists numerous allegedly false or misleading statements issued by STS beginning with the secondary offering registration statement filed January 17, 1997, and continuing through the class period ending April 2, 1998. The class period ended on the date of STS's press release announcing a revenue shortfall of $6.0 million. As the complaint alleges, STS's "stock plunged the next trading day, . . . a 39% drop on the April 2 announcement, and a drop in excess of 50% from the . . . sale price just two months earlier." We conclude, given the precipitous decline in the price of STS stock over a few months, the February press release projecting an earnings shortfall, and the April press release reporting the $6.0 million projected loss for 2Q'98, that there were sufficiently threatening storm clouds to put the Caprins on inquiry notice of possible fraudulent activity by STS as early as April 2, 1998.

Following Sterlin, we must next determine how long it would take a

-10-

reasonable investor, once on notice and exercising reasonable diligence, to discover the facts underlying the alleged fraud. The Caprins argue that no reasonable investor could have discovered the improper accrual accounting, and therefore the statute of limitations has yet to run. However, much of the information submitted by the Caprins as the factual basis underlying their accounting fraud claims is based on public information, including the secondary offering registration statement and prospectus, and SEC 10-Q[3] filings. As explained above, a reasonable investor need only be on notice of the possibility of fraud, not on notice of the precise contours of the fraudulent scheme for the statute of limitations to start running; as a result, we find the Caprins' argument unavailing.

Although the district court did not elaborate upon its application of the two-step statute of limitations analysis required by Sterlin, after finding that appellants had inquiry notice as of April 2, 1998, it stated, "there can be no doubt that a reasonable investigation would have uncovered facts underlying the dilatory Securities Act claims that plaintiffs have purported to assert." Caprin v. Simon Transp. Servs., 112 F. Supp. 2d. 1251, 1259 (D. Utah 2000). Further, the district court explained that reasonable investigation would have uncovered factual

---

[3] Form 10-Q is the form used to file quarterly reports to the SEC as required by either section 13 or 15(d) of the Securities Exchange Act. 15 U.S.C. § 78m and 78o(d).

support for the Caprins' claims regarding STS's insurance accruals, operating expenses, and the company's allegedly misleading statements regarding driver safety and training. Without deciding the precise amount of time the Caprins needed to uncover the facts underlying the alleged fraud in this case, we agree with the district court that sufficient facts to support the claims now before us could have been uncovered shortly following the April 2 press release; as a result, we conclude the district court correctly dismissed the Securities Act claims as untimely.

In a related matter, the Caprins tersely suggest in their reply brief that their Securities Act claims should relate back to the date of the original complaint under Rule 15(c)(2) of the Federal Rules of Civil Procedure. In considering this claim, we note that although the Caprins' Securities Act claims appear to largely echo their Exchange Act claims, the Second Amended Complaint distinguishes between the Securities Act and Exchange Act claims by referring to a "Securities Act Class" comprised of investors who bought STS stock pursuant to STS's registration statement and prospectus filed for the secondary offering, and an "Exchange Act Class" comprised of investors who bought STS stock on the open market. Throughout the rest of the complaint, however, the plaintiffs are referred to collectively.

The plain language of Rule 15(c)(2)[4] does not address the addition of new plaintiffs with legal claims based upon the same general course of conduct asserted but arising under a different statute. Fed. R. Civ. P. 15(c)(2). Allowing the Securities Act claims to relate back to the Exchange Act claims would effectively permit this new set of plaintiffs to piggy-back their Securities Act claims upon the timely filed Exchange Act complaint. In addition, allowing the Securities Act claims to relate back to the Exchange Act claims would seem to circumvent the entire purpose of inquiry notice as explained in Sterlin; if the Exchange Act plaintiffs here had adequate notice to timely file suit regarding fraudulent activity in the secondary offering of STS stock, permitting the Securities Act plaintiffs' claims to relate back exempts them from the one-year, inquiry notice statute of limitations entirely. Inquiry notice serves to "trigger[] an investor's duty to exercise reasonable diligence." Sterlin, 154 F.3d at 1201. Allowing the claims to relate back in this case would relieve the Securities Act plaintiffs of their duty to reasonably investigate the possibility of fraudulent activities in a timely manner. As a result, we conclude that the Securities Act claims are untimely and were properly dismissed by the district court.

---

[4] Rule 15(c)(2) states in pertinent part that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2).

-13-

**III**

Next we must determine if the district court erred in dismissing the Caprins' Exchange Act claims for failure to satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("the Reform Act"). We review de novo a district court's dismissal for failure to plead fraud with sufficient particularity under Federal Rule of Civil Procedure 9(b), confining our analysis to the text of the complaint. Koch v. Koch Indus., Inc., 203 F.3d 1202, 1236 (10th Cir. 2000). Under Rule 9(b), a complaint must identify the time, place, and content of each allegedly fraudulent representation or omission, identify the person responsible for it, and identify the consequences thereof. Id. Memorably put, "[t]his means the who, what, when, where, and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).

The Reform Act amended the Securities Act of 1933 and the Exchange Act of 1934, in part by heightening the pleading requirements in securities fraud lawsuits. City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1258–59 (10th Cir. 2001). In cases brought under federal securities law, when a plaintiff alleges that the defendant made a false statement of a material fact or omitted a material fact necessary to prevent the statements made from being misleading, he or she must specify each allegedly false or misleading statement and explain why

-14-

it is false. 15 U.S.C. § 78u-4(b)(1). Additionally, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each alleged securities law violation. 15 U.S.C. § 78u-4(b)(2). If a complaint fails to meet these requirements, the Reform Act requires dismissal. 15 U.S.C. § 78u-4(b)(3)(A).

Under the Exchange Act, the primary private cause of action arises under SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under 10-b of the Exchange Act, 15 U.S.C. § 78j. Both § 78j and Rule 10b-5 prohibit the use of manipulative and deceptive devices in the sale of securities. Rule 10b-5 also explicitly forbids "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact" in connection with the purchase or sale of a security if the fact is necessary to prevent the statement from being misleading. 17 C.F.R. § 240.10b-5(b).

The Caprins assert four general claims under the Exchange Act and Rule 10b-5. First, the Caprins contend that the defendants failed to disclose that revenue was generated, in material part, by drivers violating federal safety regulations. Second, the defendants failed to disclose the true extent of spiraling operational problems and tried to artificially drive down the company's operating ratio "to maintain the illusion the Company was an attractive investment." (1 R. at 91–92 ¶5–6, 115–117 ¶56–61.) Third, defendants misled investors by

improperly accounting for insurance claims and related accident repair costs, thereby overstating earnings. Finally, the defendants reporting of equipment sales figures was materially misleading.

Because each of these claims alleges that the defendants made false statements of material fact or omitted material facts, these claims must meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Reform Act, as well as state a claim under Federal Rule 12(b)(6). To that end, we examine the details of the allegedly misleading material statements or omissions and determine whether the Caprins pled sufficiently the required state of mind—scienter.

## A

According to the Caprins, STS failed to disclose to investors that many of its drivers were violating the federal safety limits on hours of service and that a significant number of drivers had received citations for log violations. Government regulations prohibit carriers from allowing drivers to drive more than eleven hours after a ten-hour break or more than seventy hours in an eight-day period. 49 C.F.R. § 395.3. STS utilized OmniTRACS, a satellite program that allows a company to track driver identification, idle time, drive time, average speed, and safety statistics in real time without driver intervention. As a result of this technology, appellants claim that STS knew of or recklessly disregarded the

-16-

hour violations of the drivers, exposing the company to increased accident claims, which in turn contributed to the skyrocketing expenses responsible for STS's profit shortfall. According to the Caprins, the omission of the hours violations from STS's financial statements and public revenue forecasts was materially false and/or misleading in violation of the Exchange Act, because a reasonable investor would have wanted to know that part of STS's income derived from illegal excess hours driven by the company's drivers.

Even if we were to assume that the Caprins have demonstrated the materiality of the alleged driver safety violations, we conclude that they have nonetheless failed to satisfy the pleading requirements for scienter. To establish scienter in this case, the Caprins must demonstrate that "the defendant knew of the potentially material fact" and that "the defendant knew that failure to reveal the potentially material fact would likely mislead investors." Fleming, 264 F.3d at 1261 (emphasis added). While plaintiffs are not required to prove their scienter claims on the pleadings, Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1101 (10th Cir. 2003), the complaint must give rise to a "strong inference" that the defendant acted with the requisite scienter. 15 U.S.C. § 78u-4(b)(2). In Pirraglia v. Novell, Inc., 339 F.3d 1182, 1187 (10th Cir. 2003), we explained that "[w]hether an inference is a strong one cannot be decided in a vacuum;" therefore, we look to the totality of the pleadings to determine whether the

plaintiff's suggested inference is strong enough to adequately plead scienter under the Reform Act.

In an attempt to establish scienter, the Caprins allege that the defendants knowingly omitted material facts from their financial statements and public revenue forecasts regarding driver safety violations. In support of this allegation, the Caprins cite statements from former drivers who claimed that dispatchers would overlook "lost" driver log sheets or allow drivers to keep multiple sets of sheets to hide the excess hours. (1 R. at 111.) The Caprins also assume that the OmniTRACS technology enabled the defendants to know that the violations were taking place. However, appellants have neither pled facts identifying who was responsible for the OmniTRACS data or how it was used within STS, nor have they demonstrated if or when the individual defendants had knowledge of the OmniTRACS data.

Furthermore, the Caprins have not alleged any facts demonstrating that even if the individual defendants knew the details of the OmniTRACS data, that they also knew that failing to reveal this information would likely mislead investors. Rather, the Caprins' complaint is limited to allegations that the defendants either knew or recklessly disregarded the driver safety violations. Even accepting all factual allegations contained within the complaint as true, as we must for our review purposes, <u>Sutton v. Utah State Sch. for the Deaf & Blind,</u>

173 F.3d 1226, 1236 (10th Cir. 1999), we cannot say that the facts alleged here have been pled with sufficient particularity to give rise to a strong inference of scienter, as is required by the Reform Act.  Pirraglia, 339 F.3d at 1187. Because appellants have failed both to identify the person responsible for the omitted information and to allege that the defendants knew that failing to reveal this information would likely mislead investors, the district court correctly concluded that the Caprins did not satisfy the pleading requirements of the Reform Act.

**B**

Next, the Caprins allege that Simon tried to manipulate its operating ratio[5] "to maintain the illusion the Company was an attractive investment."  (1 R. at 115.**)**  This was purportedly achieved by deferring the reporting of significant costs of OS&E and the cost of repairing trucks involved in accidents to future quarters, in violation of Generally Accepted Accounting Principles ("GAAP"). As a direct result of the defendants manipulation of the operating ratio, the Caprins argue, STS's financial statements and public revenue forecasts were false and/or misleading.  The Caprins offer little factual support for these allegations, basing their claim on conclusory statements from which we are to infer STS's

_____

[5]  The operating ratio refers to the operating expenses in terms of a percentage of revenue; the lower the operating margin, the more successful the company appears to analysts.

fraudulent activities.

In support of the contention that Simon deferred reporting OS&E costs, the Caprins state that OS&E trends should roughly track revenue trends; in other words, absent fraud, gains or losses in STS's operating expenses should have followed similar gains or losses in STS's revenue. Here, the Caprins argue, no such correlation is found. STS did experience a large increase in OS&E during 2Q'98.[6] The company explained in a press release that the increase resulted from a new terminal in Atlanta, Georgia, the delivery of 280 new trailers, and disposal of 125 old trailers. The Caprins have not alleged any facts indicating that STS's explanation is incorrect or insufficient; rather, they wish the court to infer, based upon the increase in OS&E during 2Q'98 and the sale of stock by the defendants in late January of 1998 that STS's explanation for the spike in OS&E must be false.

The district court rejected these allegations for failure to state a claim under the Reform Act, concluding that the claims raised by the Caprins were inconsistent and conclusory. We agree that the Caprins have alleged an elaborate

---

[6] The complaint states that historically 12% of Simon's revenue was OS&E, but during 2Q'98, 34% of revenue was OS&E. The document cited to support this figure is Exhibit G of the Second Amended Complaint, (1 R. at 117) however, the Caprins conclusion appears to rest on a misreading of Exhibit H, which indicates that the <u>difference</u> between OS&E in 1Q'98 and 2Q'98 was 34%; OS&E was 16.9% of revenue in 2Q'98.

scheme but have not alleged sufficient facts to survive a motion to dismiss on their claim that STS fraudulently deferred OS&E.

Equally unsupported is the Caprins' allegation that STS deferred reporting of accident repair costs. The Caprins state that OS&E increased in 2Q'98 when it should have decreased because STS acquired newer equipment that was subject to manufacturer warranties; as a result, the company should have had fewer repair expenses. At no point do the Caprins demonstrate that the manufacturer's warranties cover the expenses associated with repairing a truck involved in an accident like a rollover or a jackknife. Rather, they simply conclude that the use of newer trucks should cause a decrease in accident repair expense; because this expected decrease in accident repair expenses did not materialize, they argue STS must have fraudulently deferred the reporting of accident repair costs. These "must have" allegations by the Caprins are factually insufficient to sustain a claim under the Reform Act.

As to pleading scienter, the Caprins contend that STS deferred the reporting of significant amounts of OS&E to maintain a good operating ratio in order to relay the appearance of a successful company to Wall Street analysts. Although this could be interpreted to mean that STS knew that deferring these expenses would likely mislead investors, the Caprins have not stated what potentially material facts appellees knew and omitted. This court, in evaluating scienter, will

examine motive and opportunity in the context of the totality of the circumstances, but pleading motive and opportunity alone will not establish the requisite scienter.  Fleming, 264 F.3d at 1263.  Here, the Caprins have alleged little more than the motive and opportunity to commit fraud; this is insufficient under the Reform Act.

In summary, appellants have only made general accusations regarding STS's allegedly manipulated expenses; we conclude that such allegations are not sufficiently factually supported to satisfy the Reform Act.

## C

The Caprins also allege that by underaccruing its insurance reserves—in other words, not sufficiently accumulating and setting aside money or other assets to offset potential liability—STS was able to overstate earnings in publicly disseminated documents throughout the Class Period, because money which should have been set aside to cover insurance expenses was instead reported as revenue.  Specifically, the Caprins argue that the defendants knew or recklessly disregarded the fact that the company's liability exposure was escalating because of an increased use of "over-fatigued, ill-trained and unqualified drivers" and that the company failed to accumulate sufficient reserves to cover for related foreseeable risks.  (1 R. at 117–118 ¶62.)   The district court ruled these allegations were also factually insufficient to support a claim under the Reform

Act.

In its prospectus, STS attributed its decreasing insurance and claims expense ("I&CE") to a reduction in insurance claims; STS reported decreased I&CE in its SEC 10-K for the fiscal year ending September 30, 1997. The Caprins dispute this explanation, claiming instead that the low insurance and claim expense was the result of the STS's underaccruing claims, late reporting of existing claims, and off-loading insurance claims to OS&E. In support of these allegations, the Caprins point to the "suspicious timing" of the company's reported accruals. (1 R. at 118 ¶63.) The Caprins assert that the loss run data[7] from various insurance carriers shows that STS did not set aside money or other assets to cover the potential liability for accidents in the quarter they occurred; rather, claim the Caprins, STS accrued liability in quarters following the accidents. As a result, the Caprins maintain, STS's bottom line appeared more attractive to investors than it should have.

The data offered by the Caprins indicates that STS reported a substantial number of accidents to its insurance carrier in quarters subsequent to the date of the accident, but the data does not reflect when or whether STS accrued liability for its share of the accidents. The Caprins argue that STS's accrual policy

---

[7] Loss run data is information collected by insurance companies usually reflecting type and frequency of losses for their insured; in this case, losses due to accidents.

requires it to accrue liability after it has reported an accident to its insurance carrier. Conversely, the defendants argue that STS accrued an estimated liability for its share of an accident once an accident was reported to STS, not once STS reported the accident to its insurance carrier. In either case, the loss run data from the insurance carriers does not indicate how much STS accrued or should have accrued for each accident, nor does it state when STS should have accrued liability for each accident; rather, it states only the insurance carrier's reserves and expenditures for the accident, the date of the accident, and the date the insurance carrier received notice of the accident. At no point in their pleadings do the Caprins provide estimates as to what STS's accruals should have been in response to a specific accident or in a given quarter.

The Caprins' other allegation of underaccrual is that defendants shifted I&CE to OS&E. This is a curious allegation because the Caprins earlier alleged that the defendants improperly kept OS&E low to maintain a low operating margin by deferring accident repair expenses. If we are to accept that contention, it seems highly unlikely that STS would then increase its reported OS&E by including insurance and claims expenses. Furthermore, the Caprins present no evidence that I&CE was included in OS&E. Instead the Caprins rely on the fact that I&CE increased toward the end of the class period. Because the I&CE "dramatically increased" in the second quarter of 1998, the Caprins want the court

to infer that the defendants must have manipulated the I&CE amounts in earlier quarters to keep the amounts artificially low. This is insufficient to state a claim for fraud, as the Seventh Circuit has recognized:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition . . . . There is no "fraud by hindsight" . . . and hindsight is all the [plaintiffs] offer.

DiLeo, 901 F. 2d at 627; see also, Fleming, 264 F.3d at 1260 ("Plaintiffs should not be allowed to proceed with allegations of "fraud by hindsight."); Grossman v. Novell, Inc., 120 F.3d 1112, 1124 (10th Cir. 1997) ("often there is no reason to assume that . . . simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false") (quotations omitted).

Like OS&E in 2Q'98, I&CE did increase significantly. STS stated in its April 1998 press release that this increase was the result, in part, of an "unusually severe accident experience" in 2Q'98. (Supp. App. at 79.) The Caprins fail to allege the number of accidents it believes STS actually experienced in 2Q'98; rather, the Caprins point to the United States Department of Transportation's ("USDOT") accident data to demonstrate that STS's accident experience in 2Q'98 was similar to that of earlier quarters and, therefore, STS could not have

experienced such a large increase in I&CE in 2Q'98.

Even accepting that STS's USDOT recognized accidents were not substantially different in 2Q'98 than in earlier quarters, the Caprins have failed to demonstrate that the number of non-USDOT recognized accidents in 2Q'98 did not, or could not, contribute to the spike in I&CE that STS experienced in that quarter. Nor do the Caprins demonstrate that the sheer number of non-USDOT recognized accidents (and damage therefrom) did not increase in 2Q'98. As a result, we conclude that the Caprins have not pled sufficient facts to show that STS's reported I&CE was either false or materially misleading.

In addition, the Caprins allege that the company did not experience a significant increase in accidents in 2Q'98 compared to earlier quarters, but that the defendants recklessly underaccrued insurance expenses in the face of "escalating" liability exposure due to STS's reliance on "over-fatigued, ill-trained and unqualified drivers." (1 R. at 118 ¶62). The Caprins' underaccrual allegation does not include any detailed facts regarding STS's actual accrual during the class period; specifically, the Caprins failed to describe how much was accrued and how it was insufficient given the accidents which occurred, when reserves were accrued for an accident, and why that accrual date was untimely. The Caprins do allege that the defendants must have accrued liability for accidents late because they reported accidents late; however, there is no evidence that STS did not

-26-

accrue when it became aware of an accident or that upon becoming aware of an accident, STS's subsequent accrual was insufficient. Without this information, the Caprins do not meet the pleading requirements of the Reform Act.

Finally, in order for GAAP violations to support a claim of securities fraud, the Caprins must show that the violations were the result of STS's intent to mislead investors. See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). Here, the Caprins maintain that the defendants improperly accounted for insurance claims and related accident repair costs in violation of GAAP. The Caprins have not pled facts sufficient to demonstrate that Simon did indeed violate GAAP accrual principles, let alone that those violations were committed with the intent to mislead investors. Again, appellants have failed to plead facts sufficient to support a claim of securities fraud under the Reform Act.

**D**

The Caprins' final allegation with respect to its dismissed claims is that STS failed to clarify the extent to which its income was dependent upon equipment sales in the registration statement for the secondary offering. Contending that equipment sales accounted for 35% of pre-tax income in 1995 and 38% in 1996, Caprin argues that STS failed to disclose the material fact that the used-truck market was softening and that the company would probably not see the recurring profits from equipment sales that it saw before the secondary

offering. Further exacerbating this material omission, claim the Caprins, is their allegation that STS grossly inflated the expenses it claimed for equipment sales at the end of the class period by including other expenses, like accident repair costs.

STS's prospectus and SEC 10-Q reports illustrate precisely how equipment sales were recognized and the net amount gained. Because these documents provide a general means for investors to ascertain the source of STS's income, the Caprins' argument that STS should have also provided the percentage breakdown of equipment sales as a portion of income and that the failure to do so made these statements false and/or misleading is frivolous. While this does appear to be information that a reasonable investor would like to have before buying or selling STS stock, other information was available in STS's public documents for an investor to roughly determine these figures.

The Caprins also argue that the repair costs incurred to prepare the old trailers for sale should have been listed immediately so that STS's books would accurately reflect the value of the company's assets. However, the Caprins do not indicate what portion of the repair costs were listed inadequately or late, nor do they even provide an estimate as to when and what amount should have been listed. Line items for depreciation and amortization appear in the company's public documents, and the Caprins do not indicate how these figures are incorrect or misleading. Without more, the Caprins' conclusory allegations of GAAP

violations are factually insufficient to state a claim for fraud under the Reform Act.

In summary, we conclude that the district court was correct in dismissing the Caprins' Exchange Act claims for failure to satisfy the pleading requirements of Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Reform Act.

**IV**

Finally, the Caprins argue that the district court incorrectly denied their motion to alter or amend the judgment and their motion to amend the complaint to include additional evidence. We review a district court's order denying a plaintiff's motion to alter or amend a judgment under Federal Rule of Civil Procedure 59(e), or to amend its complaint, for an abuse of discretion. Matosantos Commercial Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1213 (10th Cir. 2001); Hayes v. Whitman, 264 F.3d 1017, 1026 (10th Cir. 2001).

The district court reviewed the Caprins' motion to alter or amend the judgment based on the Caprins' claim of newly discovered evidence. In determining whether to grant a Rule 59(e) motion based on newly discovered evidence, the district court must find "that the evidence is newly discovered [and] if the evidence was available at the time of the decision being challenged, that counsel made a diligent yet unsuccessful effort to discover the evidence." Comm.

for the First Amendment v. Campbell, 962 F.2d 1517, 1523 (10th Cir. 1992) (quotation omitted) (alteration in original).

The Caprins' newly discovered evidence consisted of a collection of declarations, depositions, and documents regarding a personal injury action in a Utah state court pertaining to an STS trucking accident. The district court found that the Caprins "failed to identify that any of this evidence was newly discovered" and that the information was in fact available at the time the court was considering the motion to dismiss. Caprin v. Simon Transp. Servs., Case No. 2:98-CV-863K, slip op. at 2–3 (D. Utah Mar. 12, 2001). The personal injury action was instituted in March 1998 for an accident that took place that same month, and appellants listed the accident in its loss run data submitted as an exhibit to the Second Amended Complaint. The district court thus concluded that the Caprins had not made a diligent effort to discover the evidence. Because the Caprins were aware of this case at the time they amended their complaint for the second time, the district court did not abuse its discretion in finding that they did not make a diligent effort to uncover the new evidence and properly denied the Caprins' Rule 59(e) motion.

While the district court did not specifically rule on the Caprins' Rule 15(a) motion to amend the complaint, the ruling regarding the Rule 59(e) motion makes clear that the district court found that any amendments to include "newly

discovered evidence" would have been inappropriate and futile because the information did not qualify as newly discovered evidence and was not material. Based on these findings, the district court did not abuse its discretion in implicitly denying the Caprins' Rule 15(a) motion.

V

As to the individual defendants, the judgment of the district court is **AFFIRMED.** As to STS, this matter is **DISMISSED**.

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge